UNITED STATES DISTRICT COURT
for the
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Docket No. 1:09 CR 54

UNITED STATES OF AMERICA

       vs.

                                  )

THOMAS BRADFORD NORVELL    )
_____  )

DEFENDANT'S MEMORANDUM IN SUPPORT
OF
EMERGENCY MOTION FOR REDUCTION OF SENTENCE PURSUANT TO
18 U.S.C. §3582(c)(COMPASSIONATE RELEASE)

INTRODUCTION

Thomas Bradford Norvell has served 10 1/2 years of a 15-year sentence for conviction of transportation over the Internet of child pornography in violation of 18 U.S.C. §2252(a)(1).  Through those years, Mr. Norvell has been an exemplary inmate.  The Defendant's completion of the Residential Drug Abuse Program (RDAP) qualifies him for a 12-month reduction of his sentence and the possibility of an early release to six months in a halfway house.  Thus, in the ordinary course of events, the Defendant will be released from custody on June 4, 2022, if not earlier.

The Defendant is housed at Federal Correctional Institution Butner Low, the Bureau of Prisons (BOP) facility hardest hit by the Coronavirus.  As of June 10, 2020, Butner Low was reporting 642 infected inmates, 120 more than Forest City Low FCI, the institution with the next highest number.  As of this filing, 20 inmates and one correctional office have died at the overall Butner complex from

complications related to COVID-19 – twelve of the dead were at Butner Low.[1]

Mr. Norvell is at significant risk. He is 53 years old and has suffered with asthma since childhood. His circumstances are further complicated by a pressing need for knee replacement surgery.

On June 9, 2020, Mr. Norvell's cellmate tested positive for Coronavirus.

STATUTORY FRAMEWORK

Title 18 United States Code §3582(c)(1)(A)(1) permits a sentencing court to reduce a previously imposed term of imprisonment and to substitute a term of supervised released upon appropriate conditions if the court finds that "extraordinary and compelling reasons warrant such a reduction". The statute provides:

(1) in any case - - -

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –

(i)     extraordinary and compelling reasons warrant
        such a reduction; . . .
        and that such a reduction is consistent with
        applicable policy statements issued by the
        Sentencing Commission.

---

[1]Eleven Butner Low inmates and one correctional officer have died.

18 U.S.C. §3582(c)(1)(A).

Expanded home confinement is also authorized by the Coronavirus Aid, Relief and Economic Security Act (116 Pub.L.36))(CARES Act). Section 12003 of the Act provides:

> "(b) Supply of Personal Protection Equipment and Test Kits to Bureau of Prisons; Home Confinement Authority. --
>
> . . .
>
> (2) Home confinement authority. – During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau my lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c_(2) of title 18, United States Code, as the Director determines appropriate."

In a memorandum issued on March 26, 2020, Attorney General Barr provided the BOP Director with a list of criteria and directed that he begin reviewing inmates with COVID-19 risk factors to determine inmates appropriate for transfer to home confinement. The Attorney General, on April 3, urged the BOP to immediately maximize transfers to home confinement of at-risk inmates held at FCI Oakdale, FCI Danbury, FCI Elkton and "other similarly situated facilities". Since April 3, conditions at the Butner Complex have worsened beyond those at Oakdale, Danbury and Elkton.

## BACKGROUND

Brad Norvell was arrested by the Morganton Police Department on November 21, 2006 on the charge of Second-Degree Sexual Exploitation of a Minor (N.C. Gen. Stat. §14-190.17). In the course of an Instant Message chat, Mr. Norvell had forwarded several pornographic images to a police officer posing as a 14-year-old boy. When Morganton police officers executed a search warrant on the Defendant's home on November 14, 2006, Mr. Norvell immediately granted them

entry.  He admitted that he had transmitted pornographic images – both photographs and videos – on the Internet.  He directed the officers' attention to several computers and external hard-drives, informing them that illegal imagery would be found on those devices.  He voluntarily signed a consent form, authorizing the seizure and inspection of the computers.  He was extraordinarily cooperative with law enforcement from the outset of his involvement with them.

The elements of the state offense – relevant to Mr.  Norvell – are the distribution or transportation of materials that contain a visual representation of a minor engaged in sexual activity.  The basis of the state charges, subsequently dismissed, was the exact conduct which constitutes the offense to which he eventually pled guilty in this Court.

Mr.  Norvell's state charges remained in limbo for two and a half years.  He surrendered all of his computers, although doing so is not typically a condition of pretrial release in state court.   He did not re-acquire a computer for personal use or access a computer for any purpose other than job-related business.  He stopped drinking.  Immediately after his 2006 arrest, Mr.  Norvell began psychological counseling specific to pornography and alcohol abuse.  He faithfully attended Alcoholics Anonymous.  He was still attending counseling sessions when he was incarcerated following his guilty plea to federal charges on December 31, 2009.

 He was indicted on federal charges on June 2, 2009.   One December 31, 2009, he entered a plea of guilty to one count of transporting child pornography.  Three years and two months had passed since his offense.  During that time, he had not violated any condition of his state or federal pretrial release.  He had submitted to a sex-offender-specific psychosexual evaluation and had followed every recommendation of that evaluation.  He had participated in 20 months of therapy.  He had made religious practice the center of his life and had followed his religious

beliefs into "conversion therapy", a attempt to alter his sexual orientation.[2]

Another year and seven months would pass before he was sentenced. During the four years after his state arrest and before his commitment to the BOP, the Defendant did everything the criminal justice system asked of him. He acknowledged the seriousness of his offenses. He demonstrated remorse. Most significantly, he undertook extraordinary efforts to rehabilitate himself and make amends to his community.

With credit for pretrial confinement, the Defendant has served over 10.5 years – 67% – of his 15.7-year sentence. The additional credit for participation in various programs effectively reduces his sentence to 14,7 years, of which he has served 71%. At present, he is housed at Federal Correctional Institution Butner Low, Butner, North Carolina.

Mr. Norvell has been an exemplary inmate.[3]

- In April, 2017, he moved into the Residential Drug Abuse Program (RDAP). He completed the program in December, 2017.

---

[2]In 2007 and 2008, Norvell attended two national "Love Won Out" conferences, in Charlotte and in Memphis. "Love Won Out" was a "conversion therapy" or "reparative" ministry founded by Focus on the Family and administered by Exodus International. The ministry sought to "help people who wished to limit their homosexual desires". Prior to his Rule 11 hearing on December 31, 2009, Mr. Norvell had enrolled in "Love In Action" in Memphis, Tennessee, a 30-day residential rehabilitation program which targets child pornography offenders. His resulting detention prevented his participation in the program. Alan Chambers, then president of Exodus International, testified at Mr. Norvell's sentencing hearing.

[3]The Defendant's disciplinary record during his 10.5 years of confinement reflects a single infraction. While awaiting sentencing in this Court, the Defendant had conducted a Bible study group in the McDowell County Jail. Very soon after his 2011 confinement to the Bureau of Prisons, he wrote a letter of encouragement to a McDowell Jail detainee who had been a member of that group. Mr. Norvell did not have the man's address so he enclosed the letter in an envelope addressed to his mother with the request that she forward it. He was aware that BOP personnel inspect all prisoner mail. In the nine years since, he has had no infractions.

- Throughout his time in the BOP, Mr. Norvell has attended and led an Alcoholics Anonymous group.

- Mr. Norvell was assigned initially to FCI Allenwood, White Deer, Pennsylvania. In 2013, FCI Allenwood did not have an intensive sexual addiction support group. Working with the Psychology Department at FCI Allenwood, Mr. Norvell and others designed a curriculum and began a program, Following his completion of the program, the Defendant continued his involvement and facilitated the participation of others in the program.

- BOP inmates have the opportunity to participate in various work details. When Mr. Norvell arrived at Allenwood in 2011, he began work in the prison laundry. Within three months, he was offered a position in the chapel. From 2011 until he transferred to FCI Butner Low in January, 2018, Mr. Norvell served as the head clerk to the prison chaplain. He oversaw the daily operations of the chaplaincy; compiled schedules for other chaplaincy workers; planned and led all events for the Protestant prison community; and arranged for materials for the services of all denominations at Allenwood.

- Since his transfer to Butner, Mr. Norvell has served and continues to serve as tutor for fellow inmates for whom English is a second language.

- While in custody, Mr. Norvell took on-line courses through Christian Bible College and Seminary, Blue Springs, Missouri, and completed the requirements for certifications in Christian counseling.

The Defendant's completion of the RDAP program qualified him for a 12-month reduction in his sentence, so that he will be eligible for release on June 4,

2022.  His thorough-going participation in prison programs could result in an earlier release to a half-way house,

In implementing the First Step Act of 2018, the BoP began administering the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN).  The Defendant's score placed him in the "minimum risk" range.

COVID-19 has created a crisis in the prison population more concentrated and immediate than the crisis faced by the general population.  The situation is particularly dire within the Butner complex.

Since Attorney General Barr's April 3 memorandum, the Butner complex has surpassed FCI Oakdale, FCI Danbury and FCI Elkton in the number of inmates infected with Coronavirus and has experienced more COVID-19 deaths than any of the three facilities cited by General Barr.  As of May 27, 2020, the BOP was reporting these numbers:

| Facility | Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|---|
| Butner Low FCI | 122 | 4 | 1 | 0 | 38 | 8 |
| Butner Medium I & II FCI | 32 | 5 | 9 | 0 | 191 | 22 |
| Butner FMC | 4 | 3 | 0 | 0 | 1 | 7 |

Two weeks later, on June 9, Butner Low had experienced a startling increase in both infected inmates and inmate deaths:

| Facility | Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|---|
| Butner Low FCI | 642 | 9 | 9[4] | 1 | 45 | 6 |
| Butner Medium I & II FCI | 31 | 4 | 9 | 0 | 190 | 24 |
| Butner Medium II FCI | 2 | 0 | 0 | 0 | 0 | 0 |
| Butner FMC | 4 | 2 | 0 | 0 | 1 | 8 |

On June 10, there were more infected inmates – 642 – at Butner Low than at any other BOP facility. Only Fort Worth FMC – a prison medical facility – had experienced more inmate deaths.[5] The number of deaths at the overall Butner Complex was significantly more than the number at any other BOP institution. The only BOP correctional officer to die of COVID-19 was on the staff at Butner Low.[6]

---

[4]Among the dead at Butner Low was Bobby Lee Medford, former sheriff of Buncombe County, North Carolina. Medford died of complications related to COVID-19 on June 3. In 2008, Medford had been sentenced in this Court to 15 years in prison upon his conviction of corruption and extortion charges related to kickbacks from illegal video poker operations. At the time of his death, Medford was 74 years old. https://www.citizen-times.com/story/news/local/2020/06/03/former-sheriff-bobby-medford -dies-federal-custody-covid-19/3138985001/

[5]By the date of this filing, 11 Butner Low inmates and one staff member had died. Fort Worth FMC had 11 inmate deaths and no staff deaths. Nine Butner Medium inmates had died.

[6]Federal Bureau of Prisons website. https://www.bop.gov/coronavirus/. Charlynn Phillips, 51, a career correctional officer, had worked at Butner Low for almost a decade.

On June 9, Mr. Norvell's cellmate tested positive for the virus.

On May 26, 2020, attorneys representing 11 Butner inmates filed a Petition for Writ of Habeas Corpus Under 28 U.S.C. §2241 and Class Action for Injunctive and Declaratory Relief.[7] That petition amplified and provided detailed content to the concerns of the Attorney General:

> "People housed at Butner – a complex that is well over capacity – are packed into crowded dormitories, small cells, and narrow hallways. They cannot physically distance themselves from each other or self-quarantine. They cannot insure that others are effectively quarantined if they are infected. Instead, they must sleep within a few feet of one another – often in small cubicles – use communal bath facilities, and line up close to one another several times a day for food and medicine. Butner's health care system is grossly inadequate to treat the growing number of sick men. The Federal Bureau of Prisons has inadequate infection surveillance, testing, quarantine, and isolation practices, further exacerbating the crisis. What is more, people with pre-existing medical conditions often do not receive the treatment needed for their underlying conditions, presumably because the prison's medical resources are over-taxed."

The lawsuit seeks:

1. Certification as a class action;

2. Entry of a temporary restraining order or preliminary injunction and/or writ of habeas corpus

    – ordering the BOP to identify immediately all persons incarcerated at Butner who fit with the Medically Vulnerable Subclass;

---

Previously, she had worked at a federal prison in Sumterville, Florida. Hers was the first confirmed COVID-19 death of a federal prison staff member. An April, 2020 post-mortem examination of a 43-year old caseworker at the U.S. Penitentiary in Atlanta found evidence of COVID-19 but her death has not been acknowledged by the bureau as COVID-related. https://www.newsobserver.com/news/coronavirus/article243239061.html

[7]Hallinan v. Scarantino, N0. 5:20-HC-2088-FL (EDNC).

> – appointing an expert to determine appropriate categories of release for each within 48 hours of entrance of the order or injunction;
>
> – requiring the BOP to release, within twenty-four (24) hours of the creation of the Expert List, and without quarantining at Butner, all persons identified by the court-appointed expert as appropriate for release.

As an inmate at FCI Butner Low, Defendant Norvell is included within the petitioner class.  His age and medical condition qualify him as a member of the Medically Vulnerable Subclass.

Mr.  Norvell's efforts to obtain administrative relief have been rebuffed and ignored.


ARGUMENT

A.     The Court has the authority to consider Mr.  Norvell's motion.

The First Step Act of 2018 expanded the compassionate release statute to permit courts to consider motions filed by defendants[8] themselves as long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or the warden of the defendant's facility has not responded within 30 days to the defendant's request for the filing of a motion on his behalf".  Pub.  L.  115-391 §603(b), 132 Stat.  5194, 5239 (December 21, 2018).

---

[8]Prior to the First Step Act, compassionate relief could be sought only on motion of the Director of the BOP.

The Defendant has been denied access to the Administrative Remedies Process. (ARP). The ARP is a five-step process. The inmate first should present the issue to a member of the BOP staff. If the informal request is unsuccessful, the inmate must submit a Request for Administrative Remedy to the warden on a BP-9 form within 20 calendar days of the date of the occurrence giving rise to the request. 28 C.F.R. §542.14(a). The Warden has 20 calendar days to respond. 28 C.F.R. §542.18. Within 20 calendar days from the date of the Warden's signed denial of the request or within 20 days after the Warden's response deadline, if the Warden fails to respond, the prisoner must file an appeal on a BP-10 form with the appropriate BOP Regional Director. 28 C.F.R. §542.15(a). The Regional Director has 30 calendar days to respond. If the Regional Director upholds the denial, the prisoner must file an appeal on a BP-11 form to the BOP's General Counsel. The General Counsel has 40 calendar days within which to respond. 28 C.F.R. §542.18. Various extensions of up to 60 days are available to the BOP staff.

On our about April 1, 2020, Defendant Norvell submitted a written compassionate release request to Ms. Taborn, his case manager on the "Unit Team". Ms. Taborn responded, in writing:

> "Once guidance is received in reference to CARES Act affecting inmates' release, you will be reviewed. Thank you. Ms. Taborn."

On April 9, 2020, Mr. Norvell filed an Inmate Request to Staff (BP-S148.066). His written request complied with 28 C.F.R. §542.14(a). He specifically requested "compassionate release", citing 18 U.S.C. §3582(c)(1)(A). He made reference to the pronouncements of Attorney General Barr. He noted that he was over 50 years old and suffered with asthma. He provided the information that his PATTERN score placed him in the "minimum risk" category. He detailed his proposed living arrangement upon his release.

To date, Mr. Norvell has received no response from Warden Thomas Scarantino. His request form was returned to him with a handwritten

"disposition" signed by K. Cook, who is a social worker:

> "For Home Confinement requests please see Unit Team.  Please see forms and submit accordingly.  At present, there remains no change to the BOP's RIS [reduction in sentence] criteria based only on possible exposure to COVID-19."

Ms. Cook's "disposition" left Mr.  Norvell where he had begun – with a written submission to his Unit Team.  Further, Ms.  Cook's assertion that "there remains no change in the BOP's criteria based only on possible exposure to COVID-19" was misleading.[9]  Her written response came 11 days after General Barr's directive which very much changed the BOP's criteria for release based solely on the spread of COVID-19 within the BOP.

In any event, Mr.  Norvell's submission – despite Ms.  Cook's formal recognition of the lengthy written document as a "Home Confinement request" and a "RIS" request – was never transmitted to the warden or, if it was. the warden has not responded.   If his request was communicated to the warden, more than 30 days have passed without a response.

Apparently, the BOP regards release to home confinement for reasons related to COVID-19 as a process outside of the compassionate release statutory framework.  On June 10, 2020, a BOP spokesperson informed the media that:

> "The Department of Justice confirmed that the BOP has discretion under the Attorney General's memoranda on March 26 and April 3 regarding which home confinement cases are appropriate for review in order to fight the spread of the pandemic.  The BOP will proceed expeditiously consistent with that confirmation."

> "Inmates do not need to apply to be considered for home

---

[9]Ms.  Cook's response also implies that a COVID-19-related home confinement/reduction in sentence requests – if they can be considered at all "at present" – invoke procedures outside of the ARP.

confinement.  Case management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General."[10] [Emphasis supplied.]

Further, the Court may dispense with, on equitable grounds, formal compliance with the Administrative Remedies Procedure.  See e.g. United States v. Bess, 2020 WL 1940809 at 4-5 (W.D.N.Y., April 22, 2020)(". . . [T]he COVID-19 pandemic presents extraordinary circumstances that are beyond [the defendant's] control.  Were this Court not to excuse [the defendant's] failure to exhaust, the outcome easily could be fatal."]

B.     Mr.  Norvell's vulnerability to COVID-19 and the conditions at Butner Low FCI are extraordinary and compelling reasons for an immediate conversion of the balance of his term of imprisonment to a term of home confinement.

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction.  It is difficult to imagine a more extraordinary circumstance than the encroachment of a pestilence into a prison population nor a circumstance more compelling for the members of that population.

1.     The Court has authority to find extraordinary and compelling reasons other than those expressly identified in the commentary to U.S.S.G. §1B1.13.

Title 28 U.S.C. §994(t) delegates to the Sentencing Commission the authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples".  The application notes to the policy statement accompanying U.S.S.G.

_____

[10]E-mail from Office of Public Affairs, Information, Policy and Public Affairs Division, Federal Bureau of Prisons to John Boyle, Asheville Citizen Times, July 9, 2020.

§1B1.13 provide examples of "extraordinary and compelling reasons": (1) an inmate's terminal illness; (2) a debilitating physical or mental healthy condition; (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. §1B1.13 comment. n.1(A)-(C). A fifth catch-all provision permits adjustment of a sentence for "extraordinary and compelling reasons other than, or in combination with, the reasons described in subdivisions (A) through (C)" but provides that the validity of the non-specified reasons shall be determined by the Director of the Bureau of Prisons. U.S.S.G. §1B1.13, comment. n.1(D).

The requirement that the BOP Director endorse a non-specified circumstances as "extraordinary and compelling" seems to be a drafting oversight. The policy statement was last amended in November, 2018 before passage of the First Step Act and the statement presupposes that the motion can only be filed by the BOP. "A growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step statute. United States v. Mondaca, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar 3, 2020); see also United States v. Brown, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019)(citing cases). The change in the policy statement required by the change in the statute is explained in United States v. Cantu:

> "Given the change to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence modification provisions under § 3582."

No. 1:05-CR-458-1, 2019 WL 2498923 at 4 (S.D. Tex. June 17, 2019). In United States v. Redd, the court noted that §1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendant". 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020). The court went on to find that "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement'". Id.

The lack of an amendment notwithstanding, courts have held that the catch-all provision in Application Note 1(D) provides authority for judges to find extraordinary and compelling reasons beyond those listed.  See , e.g. United States v.  Fox, No.  2:14-CR-)3 DBH 2019 WL 3046086, *3 (D.  Me.  July 11, 2019)(The existing policy statement provides "helpful guidance" but "is not ultimately conclusive given the statutory change".)   In Redd, the court found that BOP approval is an artifact of the law prior to the First Step Act:

> "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance."

2020 WL 1248493, at *7 (citing cases); see also United States v.  Perez, No.  88-10094-1-JTM, 2020 WL 1180719, at *2 (D.  Kan.  Mar.  11, 2020)("[A] majority of federal districts have found the most natural reading of the amended §3582(c) and § 994(t) is that the district court assumes the same discretion of the BOP director when it considers a compassionate release motion property before it."  (Internal quotation marks omitted).

In United States v.  Young, the government agreed that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act".  No. 2:00-CR-00002-1, 2020 WL 1047815, at *2 (M.D. Tenn.  Mar.  4, 2020).  The court in Young thus joined the majority of district courts in concluding that ". . .federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentencing reduction".  Id.  at *6.

2.    Mr.  Norvell's exposure to the Coronavirus and his vulnerability to COVID-19 are extraordinary and compelling reasons for an alteration of his sentence.

Congress has recognized the extraordinary and compelling circumstance of the COVID-19 outbreak within the BOP.  The Attorney General of the United States has ordered the release of inmates into home confinement in two directives that amount to a declaration that COVID-19 meets the standards for compassionate release.   Yet, the BOP continues to ignore the reality within its walls.  So extraordinary and compelling is the spread of COVID-19 within the federal prison system generally and within the Butner complex specifically, that the American Civil Liberties Union has sought comprehensive relief from the federal courts.

`On March 25, the Coronavirus Aid, Relief, and Economic Security Act[11] was passed by unanimous vote in the United States Senate.  The next day it was passed in the House and was signed into law on March 27.  The act spoke to the specific vulnerability of the federal prison population:

"(A) Findings. – Congress finds the following:
(i)     There is an urgent need for personal protective equipment and test kids to the Bureau based on the density of the inmate population, the high traffic, the high volume of inmates, the high rate of turnover of inmates and personnel, and the number of high-security areas, within the facilities of the Bureau."

On March 26, 2020 – pursuant to the CARES Act -- United States Attorney General William Barr directed the BOP "to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with ongoing COVID-19 pandemic". [12]  One week later, on April 3, Attorney General Barr underscored the immediacy of his directive:

---

[11]116 Pub.L.136

[12]William P.  Barr, Memorandum For Director of Bureau Prisons (Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic), March 26, 2020.

"As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton.  We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions.  I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards.  In addition, the CARES Act now authorized me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons.  I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidelines below."[13]

Attorney General Barr's second order significantly expanded the pool of those eligible for home confinement.  Since the Attorney General's April 3 memorandum, the Butner complex has surpassed FCI Oakdale and FCI Danbury in the number of inmates infected with Coronavirus and has experienced more COVID-19 deaths than any of the three facilities cited by Attorney General Barr.

Despite the Attorney General's urgent orders, less than 3% of BOP inmates have been transferred to home confinement.[14]  On June 3, after six coronavirus deaths with eight days, medical staff at Butner Low undertook testing of all inmates in an apparent effort to separate infected inmates from those not yet infected.  It remains unclear how effective separation will be maintained.

On May 26, 2020, attorneys representing 11 Butner inmates filed a Petition for Writ of Habeas Corpus Under 28 U.S.C. §2241 and Class Action for Injunctive and

---

[13]William P.  Barr, Memorandum For Director of Bureau of Prisons (Increasing Use of Home Confinement at Institutions Most Affected by COVID-19), April 3, 2020.

[14]"Bill Barr Promised to Release Prisoners Threatened by Coronavirus – Even as the Feds Secretly Made It Harder for Them to Get Out, Ian MacDougall, Pro Publica, May 26, 2020. https://www.propublica.org/article/bill-barr-promised-to-release-prisoners-threatened-by-coronavirus-even-as-the-feds-secretly-made-it-harder-for-them-to-get-out.

Declaratory Relief.[15]   That petition amplified and provided detailed content to the concerns of the Attorney General:

> "People housed at Butner – a complex that is well over capacity – are packed into crowded dormitories, small cells, and narrow hallways. They cannot physically distance themselves from other or self-quarantine.  They cannot insure that others are effectively quarantined if they are infected.  Instead, they must sleep within a few feet of one another – often in small cubicles – use communal bath facilities, and line up close to one another several times a day for food and medicine. Butner's health care system is grossly inadequate to treat the growing number of sick men.  The Federal Bureau of Prisons has inadequate infection surveillance, testing, quarantine, and isolation practices, further exacerbating the crisis.  What is more, people with pre-existing medical conditions often do not receive the treatment needed for their underlying conditions, presumably because the prison's medical resources are over-taxed."

The lawsuit seeks:

1.  Certification as a class action;

2.  Entry of a temporary restraining order or preliminary injunction and/or writ of habeas corpus

> – ordering the BOP to identify immediately all persons incarcerated at Butner who fit with the Medically Vulnerable Subclass;

> – appointing an expert to determine appropriate categories of release for each within 48 hours of entrance of the order or injunction.

> – requiring the BOP to release, within twenty-four (24) hours of the creation of the Expert List, and without quarantining at Butner, all persons identified by the court-appointed expert as appropriate for release.

---

[15]Hallinan v.  Scarantino, NO.  5:20-HC-2088-FL (EDNC).

As an inmate at FCI Butner Low, Defendant Norvell is included within the petitioner class.  His age and medical condition qualify him as a member of the Medically Vulnerable Subclass.

On June 11, United States District Court Judge Louise W.  Flanagan denied the motion for a temporary restraining order, preliminary injunction and a writ of habeas corpus.  The court found that the BOP had not acted with "deliberate indifference'", the subjective prong of the petitioners' claim:

> 'The court agrees with the petitioners that the public interest is served by preventing unnecessary illness and death and slowing the spread of the virus.  Respondents, however, have made reasonable efforts to achieve those goals.  Particularly in the absence of substantial evidence showing respondents were deliberately indifferent to the spread of COVID-19, the record at this state does not present 'extraordinary circumstances' justifying judicial intervention in the management of FCC-Butner's response to the virus."[16]

For the purposes of Defendant Norvell's motion, the court's reasoning is instructive.

> "Here, petitioners have submitted sufficient evidence to preliminarily establish the objective prong of their claim.  As respondents acknowledge,, COVID-19 poses significant health risks to both the world and community at large.  The disease's uncontrolled spread within FCC-Butner therefore presents a 'substantial risk of serious or substantial' physical injury resulting from the challenged conditions." [Internal citations omitted.]

Further, the petitioners had "sufficiently established likelihood of irreparable harm":

---

[16]Hallinan, Order, p.  36. Federal courts should take over management of prisons only under "the most extraordinary circumstances".  See Taylor v.  Freeman, 34 F.3d 266.  (4th Cir. 1994)("It is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgement for that of the trained penological authorities charged with the administration of such facilities.") The "most extraordinary circumstances" standard presents a higher threshold than the "extraordinary and compelling" standard for compassionate release under 18 U.S.C. §3582(c).

"The medically vulnerable subclass members are likely to suffer imminent serious medical complications (including death) if they contract COVID-19. An order directing respondents to 'release' the subclass members to home confinement, halfway house, another FBOP facility where COVID-19 is not spreading, or to medical furlough would reduce their chances of contracting COVID-19. The risk of irreparable injury also is 'likely' where the outbreak at FCC-Butner is worsening by the day. Accordingly, petitioners have made a clear showing they are likely to suffer irreparable harm in the absence of injunctive relief."[17] [Internal citation omitted.]

In a footnote, the court pointedly observed:

"As respondents argue, petitioners and other members of the medically vulnerable subclass individually can apply for home confinement, halfway house placement, compassionate release, or medical furloughs. But the evidence here shows that respondents only rarely approve such requests."[18]

Judge Flanagan seemed to be suggesting that while the harm faced by the Butner inmates was real and immediate, the relief which they sought as a class would be more appropriately addressed on a case by case basis.

C.    Transferring Mr. Norvell to Home Confinement Is Appropriate under the Applicable §3553(a) Factors.

1.    The nature and circumstances of the offense.

The nature and circumstances of Mr. Norvell's offense are set forth above.

Attorney General Barr's March 26 memo declares that "[s]ome offenses, such as sex offenses, will render an inmate ineligible for home detention".[19]   Title 18 U.S.C. §3582(c) does not exclude sex offenders from compassionate release

---

[17]Id. at 34-45.

[18]Id., fn 9, at 35.

[19]The categorical exclusion of the Defendant from the possibility of a COVID-19-related release is in itself an extraordinary and compelling circumstance which calls out for the intervention of this Court.

consideration.  The Attorney General's second memorandum, on April 3, appears to remove that limitation:

> "While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions.  I am therefore directing you to immediately review inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations.  You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems.  And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates – not only those who were previously eligible for transfer. [Emphasis supplied.]"[20]

Under the BOP designation protocol, conviction of a sex offense is a "public safety factor" which restricted Mr.  Norvell to a minimum security level of "Low"[21] and which may influence the BOP consideration of his eligibility for CARES Act home detention.[22]   Mr.  Norvell has no criminal history other than his conviction herein.  Since his last viewing of child pornography 13 ½ years ago, he has taken extraordinary steps to insure that he will never re-offend.  His sentence includes

---

[20]In United States v.  Fischman, the district court granted the defendant, who had tested positive for COVID-19, immediate release to home confinement under 18 U.S.C. §3582(c)(1)(A)(I).  Case No.  16-cr-00246-HSG-1 (N.D.Cal.  May 1, 2020).  Mr.  Fischhman was serving a sentence for possession of child pornography in violation of 18 U.S.C. § 2252.

[21]Eleven "public safety factors" are detailed in the BOP scheme.  His non-contact child pornography offense is the only factor which applies to the Defendant.
 https://federalprisonauthority.com/inmate-classification-bop-designation/

[22]If inmates convicted of child pornography offenses are ineligible for home confinement, the Defendant is entangled within a Catch 22.  There appear to be two parallel compassionate release tracks: 1.  the traditional statutory track and 2.; an ad hoc track for COVID-19.  Mr.  Norvell attempted to obtain relief under the under §3582 but was shunted into the COVID-19 home confinement line.  Now, he is told that his offense of conviction bars him from a COVID release.

lifetime supervised release during which he must remain registered as a sex offender subject to related sex offender conditions. Prior to sentencing, he participated in 20 months of sex offender therapy. He enrolled in Christian "conversion therapy" programs and, at the time when his plea required his pretrial confinement, he was scheduled to attend a 30-day residential rehabilitation program. When further treatment was unavailable in the BOP, Norvell worked with the Psychology Department at FCI Allenwood to establish a sex offender treatment program.

> 2. The history and characteristics of the defendant.
> Much about Mr. Norvell's history is set out above.

In his March 26 memorandum, Attorney General Barr set out a non-exhaustive list of factors to be considered with regard to release to home confinement. These factors mesh with §3553(a) considerations:

> – the age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines.

As noted, Butner Low alone has now surpassed Oakdale, FCI Danbury and FCI Elkton in the number of inmates infected and the number who have died. The Defendant has several of the COVID-19 risk factors. The fatality rate is higher in men and increases significantly with advancing age. Individuals over 50 are at heightened risk.[23] Data from early in the Coronavirus outbreak indicate that individuals over 50 are four times more likely to die than those in the 40-49 age

---

[23]See Declaration of Joe Goldenson, M.D. ("Goldenson Decl..") at 2; Declaration of Dr. Chris Beyrer ("Beyrer Decl.") at 2-3, 28. Xianxian Zhao, et al., Incidence, clinical characteristics and prognostic factor of patients with COVID-19; a systematic review and meta-analysis (March 20, 2020), hhps://cutt.ly/etRAkmt; Age, Sex, Existing Conditions of COVID-19 Cases and Deaths Chart https://cutt.ly/ytEimUQ (date analysis based on WHO China Joint Mission Report). Older Adults, Centers for Disease Control and Prevention, https:www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

range.[24]

The Centers for Disease Control and Prevention list moderate to severe asthma among the COVID19 risk factors, citing the dangers of pneumonia and acute respiratory disease.[25] Mr. Norvell's history of asthma dates from childhood. He is required to use a prescription inhalant.

BOP doctors have strongly recommended that Mr. Norvell undergo knee replacement surgery. That surgery would require him to be admitted to the medical center area of Butner, At present, not surprisingly, FMC Butner is over-crowded.[26] COVID-19 patients are remaining at the medical center and only transferred to an outside hospital when they experience respiratory failure.[27]

> – The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities.

Mr. Norvell is in a low security facility.

---

[24]See Robert Verity et al., Estimates of the severity of coronavirus disease 2019: a model based analysis, The Lancet (Mar. 30, 2020), available at https:www.thelancet.com/actions/showPdf??pii=S1473-3099%2820%2930243-7.

[25]Risk of Severe Illness from COVID-19, Centers for Disease Control and Prevention. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html

[26]As of May 26, 2020, BoP was reporting 909 inmates in a medical center with a maximum capacity of 743. That is , Butner FMC was 22% over capacity. Population Statistics: Inmate Population Breakdown, https://www.bop.gov/mobile/about/population_statistics.jsp. See PREA Audit Report, National PREA Resource Center, Bureau of Justice Assistance 1 (Apr. 2, 2017), https://www.bop.gov/locations/institutions/buh/PREA_butner.pdf.

[27]See, e.g., Press Release, Inmate Death at FCI Butner I, Dep't of Justice Federal Bureau of Prisons (April 13, 2020), https://www.bop.gov/resources/news/pdfs/20200413_3_press release_butner.pdf ("John Doe, went into respiratory failure at the Federal Correctional Institution (FCI) Butner I . . . . He was evaluated by institutional medical staff and transported to a local hospital for further treatment and evaluation.")

> – The inmate's conduct in prison, with inmates who
> engaged in violent or gang-related activity in prison or
> have incurred a BOP violation within the last year not
> receiving priority treatment under the Attorney
> General's memorandum.

Weighing the §3553(a) factors in consideration of a motion for compassionate release or a reduction in sentence is analogous to a re-sentencing. In Pepper v. United States, the Supreme Court held that a district court, on remand, may consider post-sentencing rehabilitation in fashioning a new sentence. 562 U.S. 476 (2011). Mr. Norvell spent nine months in the RDAP program, completing the program in December, 2017. His participation in Alcoholics Anonymous began following his arrest on state charges – over two years before his federal indictment – and has continued during the years he was on state and federal pretrial release; during his year and seven months in the McDowell County Jail awaiting sentencing herein; and throughout the nine years and four months he has been in the BOP. That is, he has been an active AA participant for over 13 years,

Mr. Norvell's involvement in starting a sex offender therapy group at FCI Allenwood is discussed above,

Central to his rehabilitation has been his religious faith. For seven years – from 2011, shortly after he arrived at Allenwood, until January, 2018 when he transferred to Butner – he served as head clerk to the prison chaplain, shouldering most of the administrative duties involved in the chaplaincy program. He took on-line courses at a Bible college-seminary which will enable him to work as a Christian counselor upon his release.

At Butner, before the COVID-19 lockdown, he taught English-as-a-Second-Language classes to his fellow inmates.

> – The inmate's score under PATTERN, with inmates who

> have anything above a minimum score not receiving
> priority treatment under the Attorney General's
> memorandum

By the BOP's own measure of rehabilitation – the Prisoner Assessment Tool Targeting Estimated Risk and Need (PATTERN)[28] – Mr. Norvell now presents a "minimum risk". This assessment tool was developed by the BOP as it worked to implement the First Step Act. Based on factors like age, prison programs completed and history of violence, PATTERN attempts to predict that likelihood that an inmate will re-offend upon release. Inmates are assigned to one of four recidivism risk categories: high, medium, low and minimum.

> – Whether the inmate has demonstrated a verifiable re-
> entry plan that will prevent recidivism and maximize
> public safety, including verification that the conditions
> under which the inmate would be confined upon release
> would present a lower risk of contracting COVID-19 than
> the inmate would face in his or her BOP facility.

In his written request for compassionate release submitted to BOP staff, Mr. Norvell set out his re-entry plan. He would be living in a small, detached residence on the property of his elderly parents. His family, including his wife and daughter, have been entirely supportive of his efforts to return home. He is prepared to resume employment immediately at the family business. He will continue participating in AA and sex offender counseling. At his expense, he will be able to undergo needed knee-replacement surgery,  He would face considerably lower risk of contracting COVID-19 under his re-entry plan.

> – The inmate's crime of conviction, and assessment of the
> danger posed by the inmate to the community. Some
> offenses, such as sex offenses, will render an inmate

---

[28]https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.

ineligible for home detention.  Other serious offenses
should weigh more heavily against consideration for home
detention.

Mr.  Norvell's crime of conviction and an assessment of the danger he would
pose to the community are discussed under Nature and Circumstances of the
Offense above.

3.     The need for the sentence imposed –

    a.     to reflect the seriousness of the offense, to promote respect for
           the law, and to provide just punishment for the offense.

Mr.  Norvell has served 71% of a sentence which this Court determined
would reflect the seriousness of the offense, promote respect for the  law, and
provide just punishment for the Defendant's offense.  All of those considerations
are altered by the specific circumstances of COVID-19 at Butner Low at this
moment.  Prisons have been described as "tinderbox for infectious disease"[29] ; "a
petri dish" for Coronavirus[30]; and "incubators" of disease[31] According to the CDC
guidelines, the only three measures effective in reducing the spread of Coronavirus
are (1) "social of physical distancing"[32]; (2) covering the mouth and nose with a
mask[33]; and vigilant hygiene practices, including frequently washing hands and

[29]United States v.  Rodriguez, 2020 WL 1627331, at *7 (E.D. Pa.  Apr.  1, 2020).

[30], P p.  19, Emergency Motion For Reduction of Sentence Pursuant to 18 U.S.C. §
3582(c)(Compassionate Release), U.S. v.  Paul Burks, Case.  No.: 3:14CR208-MOC-DSC
(WDNC), p 19.

[31]Michael Kaste, Prisons and Jails Worry About Becoming Coronavirus 'Incubators", NPR
(Mar.  13, 2020), https:www.npr.org/2020/03/13     815002735/prisons-and-jails-worry-about-
becoming-coronavirus-incubators.

[32]See, e.g.., Social Distancing, Quarantine, and Isolation, Centers for Disease Control and
Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-
distrancing.html; Beyrer Decl.  at 4; Goldenson Decl.  at 2.3.

[33]See, e.g., How to Protect Yourself and Others, Centers for Disease Control and
Prevention, http://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/prevention.html.  Goldenson Decl.  at 2-3.

disinfecting surfaces[34].    Butner Low is overcrowded: 1,201 men are housed in an area designed to hold 992.[35]   Inmates, correctional staff and service contractors are constantly moving between different housing units within the prison and in and out of the prison.[36]  The availability and use of masks is inconsistent.[37]  Historically within the BOP, hand sanitizer has been considered "contraband" and has been confiscated,[38] although it now appears that sanitizer is being provided at Butner.[39]  At the best of times, acceptable standards of sanitation and personal hygiene are difficult to maintain in prison.[40]

The conditions within the Butner complex are described in more detail in the ACLU petition and the June 11, 2020 order.

---

[34]See id.; see also COVID-19 in Correctional and Detention Facilities – United States, February-April, 2020, Centers for Disease Control and Prevention, https:222.cdc.gov/mmwr/volumes/69/wr/mm5919e1.htm (last visited May 22, 2020); Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention, https:www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 22, 2020); Goldenson Decl. at 2-3; Beyrer Decl.  at 20.

[35]See Population Statistics: Inmate Population Breakdown, Federal Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp (last updated May 21, 2020) .

[36]See generally, I.A. Binswanger et al., Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the USA Compared With the General Population, 63 J.  Epidemiology & Community Health 912 (2009)(concluding that individuals incarcerated in American prisons had a higher incidence of most chronic medical conditions than the general population, even adjusting for sociodemographic differences and alcohol consumption); see also Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Gordon, Gov.  of Maryland (Mar.  25, 2002), https://cutt.ly/stERiXk; Beyrer Decl.  at 29, 31.

[37]Petition for Writ of Habeas Corpus, Hallinan v. Scarantino, No.  5:20-HC-2088-FL (EDNC), pp.  32.  37-38, 41.

[38]Keri Blakinger & Beth Schwarzapfel, How Can Prisons Contain Coronavirus When Purell is Contraband?, ABA JOURNAL (Mar.  13, 2020), hjttps://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[39]Hallinan, Order at 12.

[40]For example, hand sanitizer is considered "contraband" by the BOP and is confiscated.

Certainly this Court would not have required that the last 30% of the Defendant's sentence include relentless exposure to a significant health risk.

        b.      to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.

Even prior to his arrest on federal charges, Mr. Norvell had responded to deterrence. COVID-19 within the BOP generally and at Butner Low specifically has altered the general deterrence calculus.

        c.      to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The Defendant is a college graduate who worked successfully in his family business prior to his incarceration. He has availed himself of all of the educational programs offered him within the BOP – with a particular concentration on faith-based counseling. As noted, he was instrumental in establishing a sexual disorders treatment program at Allenwood FCI. It appears that, at present, he may be unable to obtain vital medical care within the BOP. In fact, converting the balance of his sentence to home confinement may forestall the need for medical treatment.

CONCLUSION

The dire circumstances within the BOP in general and at Butner Low in particular have been acknowledged by the Congress of the United States; by Attorney General Barr; by Judge Flanagan; by other judges throughout the country; and by a wide variety of medical and scientific commentators. The Department of Justice – which sent Brad Norvell to federal prison – is declaring the COVID-19 pestilence within the BOP an extraordinary and compelling circumstance and recommending wholesale home confinement. Mr. Novell's vulnerability to COVID-19 should trigger his release to home confinement but is only one of a

number of justifications for that release.  The Defendant has served over 70% of his sentence.  He has been a model inmate who has worked hard at his own rehabilitation and contributed to the rehabilitation of others.  There is universal agreement that federal prison populations need immediate relief from COVID-19, yet no public official wants to be the first to open the gate.  At this point, despite the chorus of voices swelling in support of release to home confinement, this Court appears to offer Brad Norvell's only meaningful recourse.

For all of these reasons, the Defendant respectfully urges this Court to grant the relief sought.

`Respectfully submitted this 18th day of June, 2020.

DEVEREUX & BANZHOFF, PLLC
Attorneys for the Defendant
Suite 1100.  The Jackson Building
22 South Pack Square
Asheville, North Carolina  28801
Telephone:  (828) 285-9455

By:    /s/ Sean P. Devereux
Sean P. Devereux
(North Carolina State Bar #7691)

## CERTIFICATE OF SERVICE

I certify that all participants in this case are registered ECF users and that service will be accomplished through the ECF system. I certify that the foregoing document was served on the United States Attorney's office by service through the ECF system to the addressee below.

David Thorneloe
Assistant United States Attorney
U.S. Courthouse
100 Otis Street
Asheville, NC  28801

david.thorneloe@usdoj.gov

/S/ Sean P.  Devereux
Sean P.  Devereux